## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Marcus Troy Reynolds-El, | |
| Plaintiff, | Civil No. 3:25-cv-00951 (KAD) |
| v. | |
| Hillary M. Strackbein, *et al.*, | December 3, 2025 |
| Defendants. | |

## RULING ON MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS* AND RECOMMENDED RULING ON INITIAL REVIEW OF THE COMPLAINT UNDER 28 U.S.C. § 1915

### I. INTRODUCTION

This is a lawsuit filed by Marcus Troy Reynolds-El, proceeding *pro se*, against seven individual defendants. (Compl., ECF No. 1, at 1.) Mr. Reynolds-El seeks damages, injunctive relief, and declaratory relief for alleged infringements of rights accorded to him under the United States Constitution, federal law, and international treaties. (*Id.*) His claims arise out of his arrest in March 2020, his detention following the arrest, and the subsequent criminal prosecution. (*Id.* at 2-4.) He has moved for leave to proceed *in forma pauperis*, or "IFP." (ECF No. 2.)

When a plaintiff seeks permission to begin a lawsuit IFP—that is, without paying the filing fee—the court ordinarily conducts two inquiries. First, it reviews the plaintiff's financial affidavit and determines whether he is unable to pay the fee. 28 U.S.C. § 1915(a). Second, to ensure that the plaintiff is not abusing the privilege of filing a free lawsuit, the court examines his complaint to determine whether it "is frivolous," "fails to state a claim on which relief may be granted," or "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. §§

1915(e)(2)(B)(i)-(iii).  If the complaint is indeed frivolous, fails to state a claim, or seeks money damages from a person who is immune from such claims, the court must dismiss the case.  *Id.*

United States District Judge Kari A. Dooley referred this case to me—United States Magistrate Judge Thomas O. Farrish—to conduct these two inquiries.  (ECF No. 8.)  I have thoroughly reviewed the complaint and the IFP motion.  In the first step of my analysis, I conclude that the motion for leave to proceed IFP should be granted, because Mr. Reynolds-El has demonstrated that he is unable to pay the filing fee.  (See discussion, Section III *infra*.)  In the second step, I recommend that the claims in Mr. Reynolds-El's current complaint be dismissed because each claim either fails to properly invoke the Court's jurisdiction, is frivolous, fails to state a claim upon which relief may be granted, or seeks money damages from a person who is immune from such claims.  I further recommend, however, that Mr. Reynolds-El be given an opportunity to address the defects identified in this recommended ruling through an amended complaint.  (*See* discussion, Sections IV & V *infra*.)

## II.    BACKGROUND

Mr. Reynolds-El's claims originate from his 2020 arrest and the related detention and criminal prosecution.  The following facts are alleged in his complaint and, unless stated otherwise, are assumed to be true for the purposes of this Recommended Ruling.

On March 22, 2020, Mr. Reynolds-El was inside his residence in Montville, Connecticut.  (Compl. at 2.)  Three officers from the Montville Police Department, who he has named as defendants, showed up at his residence "due to a call" by a person who had broken his basement door window.  (*Id.*)  The officers demanded that Mr. Reynolds-El exit his residence.  (*Id.*)  After he exited, all three officers came up to him with their weapons pointed at him.  (*Id.*)  He was "thrown to the front porch, handcuffed behind his back, and forcibly removed from his dwelling

2

in an aggressive and painful manner." (*Id.*) The forceful treatment caused "bruising to his wrists and arms, abrasions on his torso and knees," and "a flare-up of chronic pain due to a [military] service-connected spinal condition." (*Id.*) Mr. Reynolds-El asserts that the arrest was "without lawful warrant, judicial order, or proper jurisdiction[.]" (*Id.*) He also states that the arrest reports and affidavits generated by the Montville Police about this incident contained "material omissions and misrepresentations." (*Id.* at 3.)

Mr. Reynolds-El adds that the Montville officers arrested him despite his "invocation of his protected nationality, religion, and consular rights." (*Id.* at 2.) Mr. Reynolds-El is a United States and Connecticut citizen who served during the Persian Gulf War. (*Id.* at 1, 7.) But he claims to be "of Moorish descent" (*id.* at 1), and he contends that his ancestry gives him rights under the "Treaty of Peace and Friendship, 1836, between the United States and the Moroccan Empire." (*Id.* at 2.) He says that he "informed officers that he was a Moorish American national entitled to consular access and non-interference in matters of private status, yet these protections were neither acknowledged nor upheld." (*Id.*) He asserts that the officers' failure to defer to his "Moorish American" ancestry constituted a violation not only of the 1836 treaty, but also of his "consular rights under Article 6 of the U.S. Constitution . . . and Articles 5 and 36 of the Vienna Convention on Consular Relations." (*Id.*)

After Mr. Reynolds-El was arrested, the officers transported him to a detention facility. (*Id.* at 2.) He claims that he was "denied access to medical care, a consular representative, or legal counsel." (*Id.*) The "sudden, violent nature of the arrest" triggered "a severe PTSD response," and he suffered a "mental health episode." (*Id.*) While he was in custody, he was "subjected to prolonged isolation" and "[n]o attempt was made to accommodate his mental health or religious dietary restrictions." (*Id.* at 2-3.) At some point following his arrest and detention, he was charged

with criminal offenses and appeared before defendant Judge Hillary Strackbein of the Connecticut Superior Court. (*Id.* at 3.) The prosecution was led by Defendant Carlos Cruz, a Connecticut State Prosecutor. (*Id.*) Mr. Reynolds-El made filings and oral declarations "invoking treaty rights, nationality, and jurisdictional objections," which were "disregarded or returned without being docketed or read into the record." (*Id.*)

Mr. Reynolds-El pled guilty to the criminal charges against him and was convicted. *See* State of Connecticut Judicial Branch, *Criminal/Motor Vehicle Conviction Case Detail*, jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=82fb5170-c6ae-4c27-877a-cfcaf780f7fe [https://perma.cc/E69N-7MZE] (last visited November 29, 2025).[1] The verdict was entered and he was sentenced on January 17, 2023. *Id.* Although he was sentenced to jail time, the execution of his sentences was suspended, and he was placed on probation for three years. *Id.*

Mr. Reynolds-El has now filed this lawsuit against seven defendants. The first two are Judge Strackbein and Prosecutor Cruz. (*Id.* at 1.) The next three are the arresting Montville police officers—Officers DiColella, Haigos, and Noyes. (*Id.*) Finally, Mr. Reynolds-El purports to sue Kathleen Brown, "a surety agent for Universal Fire & Casualty Insurance," and Joseph R. Pierro, "a surety agent for Allegheny Casualty Company." (*Id.*) He asserts that the two surety agents "participated in [his] unlawful detention by enforcing bond conditions against a person whose legal and diplomatic identity had not been properly adjudicated." (*Id.* at 3.) He adds that "[t]hese agents had constructive notice of [his] status and failed to take corrective action, effectively furthering the conspiracy to deprive [him] of liberty." (*Id.*)

---

[1]    The Court may take judicial notice of state court records. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (stating that "docket sheets are public records of which the court could take judicial notice").

Mr. Reynolds-El seeks four principal forms of relief.  First, he seeks money damages: "$2,500,000.00 in compensatory damages[,]" "$1,000,000.00 in punitive damages (per defendant)[,]" and "[s]pecial and nominal damages." (*Id.* at 4.) Second, he seeks "Injunctive and Declaratory Relief" in the form of "Injunction against future enforcement of false court orders" and "Sealing/expungement of records." (*Id.*) Third, he requests "Treaty and International Law Recognition," that is, "Recognition of consular jurisdiction" and "Referral of violations for international review." (*Id.*) Fourth and finally, he asks for an award of "attorney's fees," along with other, unspecified, "just relief." (*Id.*)

## III. THE FIRST INQUIRY: IFP STATUS

When a plaintiff files a complaint in federal court, ordinarily he must pay filing and administrative fees totaling $405.  *See* 28 U.S.C. § 1914.  District courts may nevertheless authorize commencement of an action "without prepayment of fees . . . by a person who submits an affidavit that includes a statement . . . that the person is unable to pay such fees."  28 U.S.C. § 1915(a)(1); *see also Coleman v. Tollefson*, 575 U.S. 532, 534 (2015) (explaining that plaintiffs who qualify for *in forma pauperis* status "may commence a civil action without prepaying fees or paying certain expenses").

To qualify as "unable to pay," the plaintiff does not have to demonstrate "absolute destitution," *Potnick v. E. State Hosp.*, 701 F.2d 243, 244 (2d Cir. 1983) (per curiam), but he does need to show that "paying such fees would constitute a serious hardship." *Fiebelkorn v. United States*, 77 Fed. Cl. 59, 62 (2007).  The United States Supreme Court has said that a plaintiff makes a "sufficient" showing of inability to pay when his affidavit demonstrates that he "cannot because of his poverty pay or give security for the costs and still be able to provide himself and his

dependents with the necessities of life." *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 339 (1948) (quotation marks omitted).

In Mr. Reynolds-El's application to proceed IFP, he states that he has no money in cash or in a savings account. (ECF No. 2, at 4.)  He owns no property or vehicles. (*Id.*)  He receives $2,150.00 per month in social security disability benefits, but he has $2,233.00 in monthly living expenses. (*Id.* at 3, 5.)  Based on these statements, I conclude that payment of the filing fee "would constitute a serious hardship." *Fiebelkorn*, 77 Fed. Cl. at 62.  I will therefore grant Mr. Reynolds-El's motion to proceed IFP.

## IV.  THE SECOND INQUIRY: REVIEW OF THE COMPLAINT

### A.  General Principles of Review under 28 U.S.C. § 1915

"A motion to proceed IFP comes with a consequence." *Ortiz v. Tinnerello*, No. 22-cv-1318 (AWT) (TOF), 2023 WL 11842871, at *1 (D. Conn. Mar. 22, 2023).  "Because IFP plaintiffs lack 'an economic incentive to refrain from filing frivolous, malicious or repetitive lawsuits' . . . [28 U.S.C. § 1915] instructs the Court to review their complaints and dismiss certain types of abusive or facially unmeritorious claims." *Emiabata v. Bartolomeo*, No. 3:21-cv-776 (OAW) (TOF), 2022 WL 4080348, at *5 (D. Conn. Jan. 3, 2022) (quoting *Neitzke v. Williams*, 490 U.S. 319, 324 (1989)).

First, the court must "dismiss the case at any time if the court determines that . . . the action . . . is frivolous or malicious." 28 U.S.C. § 1915(e)(2)(B)(i).  A complaint is "frivolous" when it is entirely without a factual or legal basis.  As the Court of Appeals has explained, an "action is 'frivolous' for §1915(e) purposes if it has no arguable basis in law or fact, as is the case if it is based on an 'indisputably meritless legal theory.'" *Montero v. Travis*, 171 F.3d 757, 759 (2d Cir. 1999) (quoting *Neitzke*, 490 U.S. at 325, 327).  "Frivolous" complaints include those that are based

on "fanciful factual allegation[s]," *Neitzke*, 490 U.S. at 325, as well as those in which a dispositive defense clearly exists "on the face of the complaint." *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995).

Second, the court must dismiss a complaint that "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). A complaint fails to state a claim when it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Facial plausibility," in turn, requires the pleading of "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. When an IFP complaint lacks this "facial plausibility," it is subject to dismissal. 28 U.S.C. § 1915(e)(2)(B)(ii); *Gordon v. Suffolk Cnty.*, 792 F. App'x 128, 129 (2d Cir. 2020) (summary order). Third, "the court shall dismiss the case" if it finds that the complaint "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(iii).

These and other pleading rules are applied liberally in favor of *pro se* plaintiffs. "Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements," courts must "construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections*, 232 F.3d 135, 139-40 (2d Cir. 2000). In other words, courts interpret *pro se* complaints "to raise the strongest arguments they suggest." *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (internal quotation marks omitted). Still, even a *pro se* plaintiff must plead a plausible claim. *See Vega v. Univ. of Conn. Med. Ctr.*, No. 3:11-cv-1864 (AVC), 2012 WL 1825381, at *1 (D. Conn. May 16, 2012) ("Although courts still have an obligation to liberally construe a *pro se* complaint, the complaint must include sufficient factual allegations to meet the standard of facial plausibility." (internal citation omitted)).

### B.    Application of These Principles to Mr. Reynolds-El's Complaint

When reviewing *pro se* IFP complaints under Section 1915(e)(2), courts examine the factual allegations and consider what theories of recovery they suggest, without limiting themselves to the theories expressly identified by the plaintiff. *See Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) (noting that, because *pro se* litigants "cannot be expected to know all of the legal theories on which they might ultimately recover," a reviewing court's "imagination should be limited only by [the] factual allegations" when determining what legal claims the complaint suggests). In *Emiabata*, for example, the plaintiff asserted six specific claims that were all barred by one sort of immunity or another. 2022 WL 4080348, at *10. But his factual allegations suggested a seventh claim—a civil rights claim under 42 U.S.C. § 1983—so the Court analyzed that claim as well, even though the plaintiff had not expressly pled it. *Id.* at *11.

Mr. Reynolds-El's complaint expressly lists several claims, arising under federal civil and criminal statutes, Connecticut common law, and several international treaties. Based on his complaint, and keeping the *Phillips* principle in mind, I identify the following attempted claims: (1) unlawful seizure and excessive force in violation of his rights under the Fourth and Fourteenth Amendments, made actionable by 42 U.S.C. § 1983 ("Section 1983"); (2) deliberate indifference to medical needs and conditions of confinement in violation of his rights under the Fourteenth Amendment; (3) false arrest and imprisonment in violation of his right to due process under the Fourteenth Amendment and Connecticut common law; (4) racial and cultural discrimination in violation of 42 U.S.C. § 1981; (5) racial and cultural discrimination in violation of 42 U.S.C. § 1985, and failure to prevent violations of § 1985, in violation of 42 U.S.C. § 1986; (6) violations of the Treaty of Peace and Friendship of 1836 between the United States and Morocco, the Convention on the Prevention and Punishment of the Crime of Genocide, the Vienna Convention on Consular Relations, the Convention Against Torture, and the International Covenant on Civil

and Political Rights; (7) conspiracy against rights in violation of 18 U.S.C. §§ 241 and 242; and (8) destruction or suppression of public records, arising under 18 U.S.C. § 2071 (concealment, removal, or mutilation generally); Conn. Gen. Stat. § 53-153 (unlawful removal or alteration of records); or the Connecticut Freedom of Information Act, Conn. Gen. Stat. §§ 1-200 *et seq.*

Before discussing these claims, I will briefly address the difference between official capacity and individual capacity suits. Mr. Reynolds-El has named seven individual defendants, and all of them are alleged to be connected to the government in some way or another. He specifically says that he is suing Officers DiColella, Haigos, and Noyes in their "individual and official capacities" (Compl. at 1), but he did not indicate whether he is suing the remaining defendants in their official capacities, their individual capacities, or both. When a plaintiff sues a state official in her official capacity, the suit is "treated as [a] suit[] against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official . . . . the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses." *Id.* Individual capacity suits, in contrast, "seek to impose individual liability upon a government officer for [her] actions under color of [ ] law." *Id.* The distinction is important because, as will be discussed below, official and individual capacity suits differ in the remedies that are available and the immunities that apply. I will read Mr. Reynolds-El's *pro se* complaint liberally and presume that he intended to name the defendants in both their individual and official capacities, to the extent applicable. [2]

---

[2]     In this case, Judge Strackbein is an official of the Connecticut Superior Court and the State of Connecticut and Prosecutor Carlos Cruz is an official of the State of Connecticut. Officers Di Colella, Haigos, and Noyes are officials of the Town of Montville. *E.g. Greene v. Waterbury Police Dep't*, No. 3:21-cv-01513 (SALM), 2021 WL 5861880, at *2 (D. Conn. Nov. 23, 2021) ("A claim against a municipal officer in his or her official capacity is essentially a claim against the

### 1. *Immunity*

Although seeking money damages "against a defendant who is immune from such relief" is the third of three ways in which an IFP complaint can fall afoul of 28 U.S.C. § 1915, in this case it makes sense to discuss immunity first, because it will address several claims at once. The most relevant immunities for this case are judicial immunity, prosecutorial immunity, and sovereign immunity.

### a. Judicial immunity

A judge is absolutely immune from lawsuits for money damages arising from her judicial actions. This is true even if the judge made a mistake while deciding the case, acted maliciously, or decided something that she arguably did not have the authority to decide. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978) (internal quotation marks omitted); see also *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) ("Even allegations of bad faith or malice cannot overcome judicial immunity."). While the doctrine of judicial immunity acknowledges that a judge may make a mistake, "it is better for a judge when exercising the discretion inherent in [her] judicial power to risk some error and possibly injury from such error than not to decide or act at all." *Tucker v. Outwater*, 118 F.3d 930, 932 (2d Cir. 1997) (internal quotation marks and citation omitted).

---

municipality for which he or she works."). Kathleen Brown and Joseph Pierro are alleged to be surety agents for Universal Fire & Casualty Insurance and Allegheny Casualty Company, respectively. (Compl. at 1.) Whether bail bond enforcement agents are "categorically state actors for purposes of § 1983 is unsettled in the Second Circuit." *Reinhardt v. City of Buffalo*, No. 1:21-cv-206 (GWC), 2022 WL 2442300, at *10 (W.D.N.Y. July 5, 2022). Assuming, *arguendo*, that Ms. Brown and Mr. Pierro are "state actors" who may be sued in an official capacity, they would be officials of the State of Connecticut.

Here, Mr. Reynolds-El complains that Judge Strackbein violated his constitutional rights and international treaty law when he appeared before her following his arrest. (Compl. at 3.) He asserts that "[t]hroughout the proceedings, [his] filings and oral declarations invoking treaty rights, nationality, and jurisdictional objections were summarily ignored" by Judge Strackbein and others, and that "[t]hese dismissals occurred in clear violation of the Supremacy Clause and the obligation of the court to honor international treaties . . . ." (*Id.*) There is no way to read these complaints as plausibly alleging that Judge Strackbein acted outside of her jurisdiction for purposes of the judicial immunity rule. Connecticut Superior Courts "are trial courts which have general jurisdiction over criminal cases." *Osorio v. Gallo*, No. 3:19-cv-151 (VAB), 2020 WL 1531300, at \*4 (D. Conn. Mar. 31, 2020); *see also* Conn. Gen. Stat. Ann. § 51-164s ("The Superior Court shall be the sole court of original jurisdiction for all causes of action, except such actions over which the courts of probate have original jurisdiction, as provided by statute."). Judge Strackbein, as a Connecticut Superior Court judge, cannot be said to have acted in complete absence of all jurisdiction when she presided over Mr. Reynolds-El's criminal proceedings.

To the extent Mr. Reynolds-El argues that Judge Strackbein acted without jurisdiction because he is personally immune from criminal prosecution as a "Moorish–American national," he is incorrect. "Under the Constitution, States have jurisdiction to prosecute crimes within their territory . . . ." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 652-53 (2022). A person's "purported status as a Moorish–American citizen does not enable him to violate state and federal laws without consequence," and persons who claim to be Moorish-American "must obey the federal and applicable state laws, just as native-born and naturalized citizens are required to do." *Allah El v. Dist. Att'y for Bronx Cnty.*, No. 09 CV 8746 (GBD), 2009 WL 3756331, at \*1 (S.D.N.Y. Nov. 4, 2009); *see also El v. Mayor of City of New York*, No. 13-cv-4079 (SLT)(CLP), 2014 WL 4954476,

at *5 (E.D.N.Y. Sept. 30, 2014) ("[T]o the extent that Plaintiff is asserting that state courts lack jurisdiction to prosecute Moorish–Americans, that argument has been repeatedly rejected."); *Smith ex rel. Bey v. Kelly,* No. 12-cv-2319 (JS)(AKT), 2012 WL 1898944, *2 (E.D.N.Y. May 24, 2012) ("The law is clear that Moorish Americans, like all citizens of the United States, are subject to the laws of the jurisdiction in which they reside.").

Mr. Reynolds-El requests retrospective declaratory and injunctive relief, in addition to money damages. But judicial immunity also extends to requests for retrospective injunctive relief, since a plaintiff "cannot avoid the application of [judicial] immunity by seeking a declaration that a judge violated his federal rights through prior adverse rulings." *Bythewood v. New York*, No. 22-2542-cv, 2023 WL 6152796, at *2 (2d Cir. Sept. 21, 2023) (summary order). In addition, Mr. Reynolds-El's request for forward-looking injunctive relief under Section 1983 is "barred by statutory judicial immunity[.]" *McCluskey v. New York State Unified Ct. Sys.*, 442 F. App'x 586, 588 (2d Cir. 2011) (summary order).[3] Section 1983, as amended in 1996, states that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983. "Declaratory relief against a judge for actions taken within his or her judicial capacity is ordinarily available by appealing the judge's order." *LeDuc v. Tilley*, No. 3:05-cv-157 (MRK), 2005 WL 1475334, at *7 (D. Conn. June 22, 2005). Mr. Reynolds-El does not plausibly allege that that Judge Strackbein violated a declaratory decree or that declaratory relief was unavailable.

---

[3]     Sections 1981, 1985, and 1986, and Connecticut common law do not contain similar statutory bars on injunctive relief. As will be discussed in Parts IV.B.1.c and Parts IV.B.4-6, these claims warrant dismissal on other grounds.

Thus, to the extent that Mr. Reynolds-El asserts claims under 42 U.S.C. §§ 1981, 1983, 1985, 1986 and Connecticut common law[4] for damages, retrospective injunctive relief, and retrospective declaratory relief against Judge Strackbein in her individual capacity, arising from any actions she took or decisions she made in the course of presiding over Mr. Reynolds-El's criminal proceedings, I recommend that those claims be dismissed. The money damage claims fall afoul of 28 U.S.C. § 1915(e)(2)(B)(iii) because they seek monetary relief from a defendant who is immune from such relief, and the claims for retrospective injunctive and declaratory relief are frivolous considering Judge Strackbein's immunity. *See* 28 U.S.C. § 1915(e)(2)(B)(i); *Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the IFP statute].").  In addition, I recommend that Mr. Reynolds-El's claim under Section 1983 for forward-looking injunctive relief against Judge Strackbein in her individual capacity be dismissed as frivolous, considering Judge Strackbein's statutory judicial immunity. *Id.*

---

[4]     Absolute judicial immunity is usually discussed in the context of Section 1983 claims, but it also extends to other claims. *See Applewhite v. Briber*, 506 F.3d 181, 181-82 (2d Cir. 2007) (applying judicial immunity doctrine to Section 1981 claims); *Turner v. Boyle*, 116 F. Supp. 3d 58, 82 (D. Conn. 2015) ("[A]bsolute [judicial] immunity extends to all civil suits, including suits brought under Section 1983 and section 1985."); *Komatsu v. City of New York*, No. 1:20-cv-6510 (LLS), 2020 WL 8641274, at *3 (S.D.N.Y. Oct. 22, 2020) ("Plaintiff's claims under [42 U.S.C. § 1983, § 1985, and § 1986] against Justice Bannon and Defendant Vaughan, in their individual capacities, are barred under the doctrine of judicial immunity.")), *aff'd*, No. 20-3676-cv, 2021 WL 6060603 (2d Cir. Dec. 20, 2021); *Lombard v. Edward J. Peters, Jr., P.C.*, 252 Conn. 623, 630 (2000) ("It is a long-standing doctrine that a judge may not be civilly sued for judicial acts he undertakes in his capacity as a judge."), *abrogated on other grounds* by *Ventura v. Town of E. Haven*, 330 Conn. 613 (2019).  Because Mr. Reynolds-El's claims of violations to international treaties, "conspiracy against rights," and "destruction or suppression of public records" fail on other grounds, *see* Parts IV.B.7-9, the Court need not determine whether judicial immunity bars those claims.

b.      Prosecutorial immunity

The Supreme Court has held that any act "undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  Prosecutorial immunity protects a prosecutor from individual civil liability "for virtually all acts, regardless of motivation, associated with his function as an advocate." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994).  "[A]bsolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009).  To determine whether absolute immunity attaches to a particular prosecutorial act, courts apply a "functional approach." *Id.*  When the prosecutor performs a certain kind of administrative obligation, "that itself is directly connected with the conduct of a trial," he may be absolutely immune from liability for those acts.  *Id.* at 344.  "Although the U.S. Supreme Court and the U.S. Court of Appeals for the Second Circuit have only applied the doctrine of absolute prosecutorial immunity to Section 1983 cases, this Court 'recognizes the same absolute immunity in Section 1985 cases.'" *Bailey v. Riehl*, No. 3:24-cv-00993 (SVN), 2024 WL 4904638, at *8 (D. Conn. Nov. 27, 2024) (quoting *Halpern v. City of New Haven*, 489 F. Supp. 841, 844 (D. Conn. 1980)).

Mr. Reynolds-El asserts that State Prosecutor Carlos Cruz, who led the criminal prosecution against him following his arrest in 2020, "erase[d] Plaintiff's religious and cultural identity" when he "proceeded on the basis of a mischaracterized legal identity."  (Compl. at 3.) He asserts that Prosecutor Cruz did so by classifying him "as 'Black' or 'African American' in court filings and official forms, contrary to his declared and documented Moorish national status."

14

(*Id.*)  He also generally alleges that the state prosecution was part of  "coordinated failure . . . to respect Plaintiff's treaty protections, nationality, and medical needs[.]"  (*Id.*)  All Mr. Reynolds-El's allegations against Prosecutor Cruz appear to arise out of documents filed and actions taking during his criminal proceedings.  The filing of "official paperwork" in connection with the proceedings, although administrative, falls within the scope of actions protected by prosecutorial immunity.  Accordingly, I recommend that to the extent that Mr. Reynolds-El asserts claims under 42 U.S.C. §§ 1983 and 1985 for monetary damages against Prosecutor Cruz in his individual capacity, arising from any actions he took in connection with the prosecution of Mr. Reynolds-El's criminal proceedings, those claims be dismissed for seeking monetary relief from a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

c.    Sovereign immunity

In our federal system, states are ordinarily immune from being sued in federal court for money damages and other retrospective relief.  The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Although the literal text of the amendment does not bar suits against a state by its own citizens, the Supreme Court long ago held that the amendment and the related doctrine of sovereign immunity imply such a bar.  *E.g., Hans v. Louisiana*, 134 U.S. 1, 20 (1890); *see also Empls. of Dep't of Pub. Health & Welfare, Missouri v. Dep't of Pub. Health & Welfare, Missouri*, 411 U.S. 279, 280 (1973) ("Although the Eleventh Amendment is not literally applicable since petitioners who brought suit are citizens of Missouri, it is established that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.").

Whether brought by its own citizen or by a citizen of a different state, "[t]he Eleventh Amendment bars a suit against a state in federal court unless that state has consented to the litigation or Congress has permissibly enacted legislation specifically overriding the state's immunity." *Huang v. Johnson*, 251 F.3d 65, 69 (2d Cir. 2001) (citation omitted). These principles apply not only to suits against the state as a whole, but also to suits against any state agency that functions as an "arm of the state." "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)).

This immunity also extends to officers of state agencies when acting in their official capacities. "A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer[.]" *Mathie v. Fries*, 121 F.3d 808, 818 (2d Cir. 1997). Thus, "[t]o the extent that a state official is sued for damages in his official capacity, 'such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state.'" *Taylor v. Norwalk Cmty. Coll.*, No. 3:13-cv-1889 (CSH), 2015 WL 5684033, at *13 (D. Conn. Sept. 28, 2015) (quoting *Rourke v. N.Y. State Dep't of Corr. Servs.*, 915 F. Supp. 525, 539 (N.D.N.Y. 1995)). To be sure, "[s]tate sovereign immunity is not absolute." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). A state may, for example, "waive its Eleventh Amendment immunity[.]" *Id*. Congress may also "abrogate state immunity and subject the states to suit, provided that, first, its intention to do so is 'unequivocally expressed' in the statutory language and, second, the legislation is enacted 'pursuant to a valid grant of constitutional authority.'" *Id*. (quoting *Tenn. v. Lane*, 541 U.S. 509, 517 (2004)). But when neither of these two exceptions apply, the Eleventh Amendment and the principle of

sovereign immunity bar federal court lawsuits seeking money damages and other retrospective relief against states, state agencies that function as "arms of the state," and state officers acting in their official capacities.  *Huang*, 251 F.3d at 69 ("The Eleventh Amendment bars a suit against a state in federal court unless that state has consented to the litigation or Congress has permissibly enacted legislation specifically overriding the state's immunity." (citation omitted)).

The Eleventh Amendment bars claims for monetary and retrospective relief, but not claims for prospective injunctive relief.  "[U]nder the venerable doctrine of *Ex parte Young*, 209 U.S. 123 . . . a plaintiff may sue a state official acting in his official capacity – notwithstanding the Eleventh Amendment – for prospective injunctive relief from violations of federal law."  *In re Deposit Ins. Agency*, 482 F.3d at 617 (quotation marks and citations omitted).  The doctrine "operates to end ongoing violations of federal law and vindicate the overriding 'federal interest in assuring the supremacy of that law.'"  *Id.* at 618 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).  Under the rule of *Ex parte Young*, "[a] plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.'"  *Id.* (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Applying these principles to Mr. Reynolds-El's case, I conclude that the Eleventh Amendment and the doctrine of sovereign immunity bar all his claims for money damages against the defendants in their official capacities.  "In order to be subject to suit in federal court, a state must expressly and unambiguously waive its sovereign immunity, or Congress must clearly and unmistakably express its intention to abrogate the immunity in the language of the particular statute."  *Wagner v. Conn. Dep't of Corr.*, 599 F. Supp. 2d 229, 238 (D. Conn. 2009).  Congress

did not abrogate the states' immunity from suit under 42 U.S.C. §§ 1981, 1983, 1985, and 1986.[5]
*See id.* (Sections 1981 and 1983); *see also Clark v. Connecticut*, No. 3:23-cv-1527 (SVN), 2024
WL 4349054, at *6 (D. Conn. Sept. 30, 2024) (Sections 1983, 1985, and 1986); *Keitt v. City of
New York*, 882 F. Supp. 2d 412, 447 (S.D.N.Y. 2011) (Sections 1983, 1985, and 1986). And
Connecticut has not waived its sovereign immunity with respect to these statutes. *See Turner*, 116
F.Supp.3d at 73; *Wagner*, 599 F. Supp. 2d at 238.

In addition to his requests for monetary relief, which are barred by the Eleventh
Amendment, Mr. Reynolds-El requests three forms of non-monetary relief. First, he requests a
"declaration of rights violations." (Compl. at 4.) This relief is foreclosed by *Ex parte Young* and
its progeny, since the *Ex parte Young* exception does not apply to requests for retrospective relief.
*T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 92 (2d Cir. 2024), *cert. denied*, 145 S.
Ct. 2700 (2025) (declining to invoke the exception when the plaintiff sought "only a declaration—
in the past tense" that the defendant violated the law); *see also P.R. Aqueduct & Sewer Auth. v.
Metcalf & Eddy*, 506 U.S. 139, 146 (1993) (concluding that *Ex parte Young* "does not permit
judgments against state officers declaring that they violated federal law in the past"). Second, Mr.
Reynolds-El requests "sealing/expungement of records." (Compl. at 4.) This request for
injunctive relief is unavailable under *Ex parte Young* because "it would not prevent an alleged
continuing violation of federal law." *T.W.*, 110 F.4th at 94. In *T.W.*, the Second Circuit concluded
that the plaintiff's request for expungement of her records was unavailable under *Ex parte Young*
because she made "no allegation that the [defendant's] maintenance of records constitutes an

---

[5]     Because Mr. Reynolds-El's claims of violations to international treaties, "conspiracy
against rights," and "destruction or suppression of public records" fail on other grounds, *see* Parts
IV.B.7-9, the Court need not determine whether sovereign immunity bars those claims.

ongoing violation of her rights." *Id.* Here, Mr. Reynolds-El does not plausibly allege that the defendants' maintenance of records concerning him is a continuing violation of federal law.[6]

Mr. Reynolds-El also requests an "[i]njunction against future enforcement of false court orders." (Compl. at 4.) Although this is not a request for monetary damages or retrospective relief, he has failed to establish standing to pursue this injunction. "Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (quoting U.S. Const. Art. 3, § 2, cl. 1). To establish standing under Article III, "the plaintiff seeking compensatory relief must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "A plaintiff must demonstrate standing for each claim and form of relief sought." *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 564 (S.D.N.Y. 2016). When seeking injunctive relief, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). In other words, it is not enough for the plaintiff to allege that he was injured in the past. To establish standing, he needs to "demonstrate that [he] is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).

Mr. Reynolds-El has alleged that his rights were violated when he was arrested, detained, and criminally prosecuted. His detention and prosecution have both ended. He does not allege that he has been in contact with or under the control of any of the defendants, nor that he will be

---

[6]    In fact, Mr. Reynolds-El appears to believe that the defendants have violated the law by not keeping *enough* records on his case. One of his claims is based on the defendants' alleged "destruction or suppression of public records." (Compl. at 4.)

in the future.  Because the complaint does not allege a real and immediate threat that Mr. Reynolds-El will again be subject to similar injury, he has not established standing to pursue injunctive relief. *See Li v. Lorenzo*, 712 F. App'x 21, 23 (2d Cir. 2017) (summary order) (concluding that claim was properly dismissed when the plaintiff "alleged injuries stemming only from past conduct with no plausible threat of future violations").  Although he asks that the Court enjoin enforcement of "false court orders," the possibility that the defendants may be involved in future enforcement of "false court orders" is too speculative to support a claim for injunctive relief.  (Compl. at 4.)

For the reasons set forth above, I recommend that Mr. Reynolds-El's claims against the defendants in their official capacities, under 42 U.S.C. §§ 1981, 1983, 1985, and 1986, be dismissed.  Specifically, I recommend that his claims for monetary and retrospective relief be dismissed for seeking monetary relief from a defendant who is immune from such relief, *see* 28 U.S.C. § 1915(e)(2)(B)(iii), and his claims for injunctive relief be dismissed for lack of Article III standing.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### 2.    *"Unlawful Seizure and Excessive Force"*

Mr. Reynolds-El asserts claims of unlawful seizure and excessive force, in violation of the Fourth and Fourteenth Amendments and actionable under 42 U.S.C. § 1983.  These claims merit dismissal because, at a minimum, they are plainly untimely under the relevant statute of limitations.

In Connecticut, most Section 1983 claims are subject to a three-year statute of limitations. For Section 1983, the statute of limitations is borrowed from the equivalent state statute for tort cases.  *See Lounsbury v. Jeffries*, 25 F.3d 131, 133 (2d Cir. 1994) ("Since Congress did not enact a statute of limitations governing actions brought under § 1983, the courts must borrow a state statute of limitations").  And under Connecticut General Statute § 52-577, the analogous state

statute for torts, the applicable statute of limitations is three years from the point of accrual.  *See Walker v. Jastremski*, 430 F.3d 560, 562 (2d Cir. 2005) (applying Connecticut's three year statute of limitations under § 52-577 to Section 1983 claim); *Sakon v. Johnson*, 724 F. Supp. 3d 31, 36 (D. Conn. 2024) (same).

The next step is to determine when the three-year statute of limitations began to run. "While state law supplies the statute of limitations period, federal law determines when a federal claim accrues," or, in other words, when the statute of limitations period begins to run.  *Kronisch v. United States*, 150 F.3d 112, 123 (2d Cir. 1998) (citation and quotation marks omitted); *see also Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (same).  "[A]ccrual occurs when a plaintiff has a complete and present cause of action."  *Spencer v. Connecticut*, 560 F. Supp. 2d 153, 159 (D. Conn. 2008).  For unlawful seizure claims, the claim accrues on the day the property was seized. *See id*.  "A seizure occurs when 'there is some meaningful interference with an individual's possessory interests' in the property seized."  *Maryland v. Macon*, 472 U.S. 463, 469 (1985) (*quoting United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  For claims of excessive force, the claim accrues "at the time the force was used[.]"  *Childs v. Grogan*, No. 3:22-cv-98 (VAB), 2022 WL 17404424, at *3 (D. Conn. Dec. 2, 2022) (citing *Helwing v. Pszeniczny*, No. 21-843, 2022 WL 610341, at *2 (2d Cir. Mar. 2, 2022) (summary order)).

Mr. Reynolds-El's claims of unlawful seizure and excessive force accrued on March 22, 2020, as they stemmed from his arrest.  He does not allege that he was deprived of any possessory interest in his property after the arrest occurred; similarly, he does not claim that any of the defendants used any force against him after his arrest.  To be sure, on March 19, 2020, the state of Connecticut suspended statutes of limitations, "as part of 'a series of executive orders' issued 'to contain and mitigate the spread of COVID-19.'"  *Esposito v. Aldarondo*, No. 3:22-cv-00621

(MPS), 2023 WL 2228412, at *3 (D. Conn. Feb. 24, 2023) (quoting *Taylor v. Pillai*, 3:21-cv-00623 (SALM), 2022 WL 4080525, at *2-3 (D. Conn. Sept. 6, 2022)).  But the suspension was lifted on March 1, 2021.  *Id.*  Therefore, Mr. Reynolds-El had three years from March 1, 2021—that is, until March 19, 2024—to bring his unlawful seizure and excessive force claims.  He filed his claim on June 12, 2025, nearly fifteen months outside the limitations period.

While statute of limitations defenses are ordinarily raised by defendants after they appear, courts can and do dismiss cases on their own initiative under Section 1915(e)(2) when an IFP plaintiff's complaint reveals that his claims are clearly untimely.  "[T]he decision that a complaint is based on an indisputably meritless legal theory, for purposes of dismissal under [Section 1915(e)(2)], may be based on a defense that appears on the face of the complaint."  *Pino*, 49 F.3d at 53.  A court should not, however, dismiss a complaint with prejudice based on an anticipated statute of limitations defense without granting the plaintiff notice and an opportunity to be heard.  *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007).  Thus, I recommend that Mr. Reynolds-El's unlawful seizure and excessive force claims be dismissed with leave to amend his complaint to show why his claims are timely, if he can.  *See Staton v. Holzbach*, No. 3:20-cv-631 (SRU), 2020 WL 6119382, at *2 (D. Conn. Oct. 16, 2020) (dismissing Section 1983 complaint on initial review without prejudice and offering plaintiff opportunity to replead), *appeal dismissed*, No. 20-3986 (L), 2021 WL 3783097 (2d Cir. Aug. 19, 2021).

### 3.    *"Deliberate Indifference to Medical and Psychological Risk"*

Mr. Reynolds-El claims that, during his custody at a detention facility, he was "denied access to medical care" for his mental health conditions, "subjected to prolonged isolation," and "denied basic human dignity."  (Compl. at 2-3.)  He states that "[n]o attempt was made to accommodate his mental health or religious dietary restrictions."  (*Id.* at 3.)  He asserts that "[t]hese

conditions constituted deliberate indifference to his medical and psychological needs, violating both the Eighth and Fourteenth Amendments[.]" (*Id.*)[7]  Records from the State of Connecticut Judicial Branch show that Mr. Reynolds-El was convicted and sentenced in January 2023, but the execution of both his sentences was suspended and he was placed on probation.  *See* State of Connecticut Judicial Branch, *Criminal/Motor Vehicle Conviction Case Detail*, jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=82fb5170-c6ae-4c27-877a-cfcaf780f7fe [https://perma.cc/E69N-7MZE] (last visited November 29, 2025). It does not appear that Mr. Reynolds-El was subject to any post-conviction imprisonment.[8]  Therefore, his deliberate indifference claims allege violations of his constitutional rights that occurred while he was in pretrial detention, prior to sentencing.

Because Mr. Reynolds-El alleges violations of his constitutional rights while he was held as a pretrial detainee, his claim of deliberate indifference to his medical and psychological needs is cognizable under the Due Process Clause of the Fourteenth Amendment instead of the Cruel and Unusual Punishments Clause of the Eighth Amendment.  "A pretrial detainee's claims are evaluated under the Due Process Clause because, pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (quotation marks, alterations, and citation omitted).  It is unclear whether Mr. Reynolds-El's complaint is best characterized as a deliberate

---

[7]     Mr. Reynolds-El also claims that these same conditions violated "international protections afforded under the Convention Against Torture and the International Covenant on Civil and Political Rights (ICCPR)."  (Compl. at 3.)  These claims are addressed in Part IV.B.7.

[8]     Although the terms of probation usually impose some restrictions, people on probation are generally not considered imprisoned.  *See, e.g., Magee v. Comm'r of Corr.*, 105 Conn. App. 210, 217, 937 A.2d 72, 76-77 (2008) (stating that "imprisonment and probation [are] separate and distinct forms of punishment" and noting that under the Connecticut statutes, a "person on parole" is considered "released" from the custody and control of the Department of Corrections).

indifference to confinement conditions claim or a deliberate indifference to medical needs claim. Regardless, for either claim, he needed to sufficiently plead two things. First, he needed to plead facts that show the alleged deprivation of his constitutional rights was "sufficiently serious[.]" *Id.* at 30; *see also Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019) (same). Second, he needed to adequately plead that the defendants either knew or should have known about the risk to his health or safety. *Charles*, 925 F.3d at 87; *Darnell*, 849 F.3d at 29-30.

For a deliberate indifference to confinement conditions claim, the alleged deprivation is sufficiently serious if the conditions of the detainee's confinement posed "an unreasonable risk of serious damage to his health[.]" *Darnell*, 849 F.3d at 30 (internal quotation marks omitted) (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). If the plaintiff alleges a sufficiently serious deprivation, he must then show that the defendants "acted intentionally to impose the alleged condition," or that the defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. For a deliberate indifference to medical needs claim, "[t]he serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86. Once the plaintiff shows a sufficiently serious deprivation, he must then show that the defendants knew that failing to provide medical treatment "would pose a substantial risk to his health[,]" or that the defendants "*should have known* that failing to provide the omitted medical treatment would pose a substantial risk to [his] health." *Id.* at 87 (emphasis in original).

A fundamental prerequisite of a Section 1983[9] claim is "personal involvement of defendants in alleged constitutional deprivations[.]" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *cf. also Tangreti v. Bachman*, 983 F.3d 609, 616 (2d Cir. 2020) (holding that "a plaintiff may not rely on a special test for supervisory liability" but must instead "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution" (citation and quotation marks omitted)). "Failing to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a complaint 'fatally defective on its face.'" *Shomo v. Dep't of Corr. & Cmty. Supervision*, No. 21-cv-00128 (PMH), 2022 WL 1406726, at *7 (S.D.N.Y. May 4, 2022) (quoting *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987)). Because Mr. Reynolds-El is presumably attempting to assert claims against all seven individual defendants in their individual capacity, "the liability of each therefore depends on a showing that he or she acted with deliberate indifference." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

Here, Mr. Reynolds-El maintains that the defendants acted with deliberate indifference to his well-being by subjecting him to "prolonged isolation," denying him "basic human dignity," and failing to accommodate his "mental health or religious dietary restrictions." (Compl. at 2-3.) Even if the Court were to assume *arguendo* that the alleged deprivation was "sufficiently serious" to give rise to a deliberate indifference claim, the complaint does not sufficiently allege that any of the remaining defendants[10] were in any way personally involved with the acts or omissions

---

[9]     Mr. Reynolds-El did not assert that this claim arose under Section 1983.    But "[c]onstitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts," *DeVillier v. Texas*, 601 U.S. 285, 286 (2024), and Section 1983 is the statute that authorizes civil lawsuits for deprivation of constitutional rights.

[10]    As discussed earlier, I recommended that the Section 1983 claims against Judge Strackbein and Attorney Cruz be dismissed on grounds of immunity.  I will note that, even if they were not immune from this claim, the allegations against Judge Strackbein and Attorney Cruz solely relate

giving rise to his deliberate indifference claim. Mr. Reynolds-El alleges that Officers Di Colella, Haigos, and Noyes transported him to the detention facility, but he does not allege that they were involved with or aware of the conditions of his detention. (*Id.* at 2.) He alleges that the surety agents "participated in Plaintiff's unlawful detention by enforcing bond conditions" (*id.* at 3), but "bond conditions" are enforced against people who have been released from detention after posting a bond. The surety agents could not plausibly have been involved with the conditions of his custody, and his deliberate indifference allegations are based solely on conditions he was subject to during custody. (*See* Compl. at 2-3 ("During custody, Plaintiff was subjected to prolonged isolation and denied basic human dignity. No attempt was made to accommodate his mental health or religious dietary restrictions. These conditions constituted deliberate indifference to his medical and psychological needs.")). Put differently, the complaint does not plausibly explain how the conditions of Mr. Reynolds-El's bond did, or could have, restricted his access to mental health care while he was in custody. Accordingly, I recommend that Mr. Reynolds-El's claim for deliberate indifference be dismissed on the ground that the complaint does not state any personal involvement by the defendants in the alleged due process violations, and therefore "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

### 4.    *"False Arrest and Imprisonment"*

Mr. Reynolds-El asserts claims of "false arrest and imprisonment" under both Section 1983 and "Connecticut common law." (Compl. at 4.) To plead a plausible claim of false arrest or false imprisonment, however, a plaintiff must allege "that the underlying charges for which [he] was arrested . . . terminated in his . . . favor." *Arpino v. Spera*, No. 3:22-cv-01114 (KAD) (TOF), 2022

---

to the criminal proceedings (*see id.* at 3), and Mr. Reynolds-El does not allege that either were in control over or even aware of the conditions of his detention.

WL 21751856, at * (D. Conn. Sept. 22, 2022) (citation and quotation marks omitted), *report and recommendation approved and adopted*, slip op. (D. Conn. Nov. 9, 2022).  Stated another way, "favorable termination is an element" of both a section 1983 claim and Connecticut common law claim "sounding in false imprisonment or false arrest."  *Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) (summary order) (quotation marks omitted); *see also Rodriguez v. Fox*, No. 3:23-cv-00823 (SVN), 2025 WL 744278, at *7 (D. Conn. Mar. 7, 2025) ("[F]avorable termination of the underlying criminal proceeding is required to establish a false arrest claim under both Connecticut law and Section 1983.").  According to judicially-noticeable public records, on January 17, 2023, Mr. Reynolds-El pled guilty and was correspondingly convicted.  An essential element of his false arrest and imprisonment claims is therefore missing.  *White v. Martel-Moylan*, 586 F. Supp. 2d 63, 69 (D. Conn. 2008) ("[T]he plaintiff can not overcome the fact that he pled guilty to charges arising out of the incident for which he was arrested and, for that reason, cannot challenge the existence of probable cause.").  Therefore, I recommend that Mr. Reynold-El's claims of false arrest and imprisonment be dismissed for failure to state a claim upon which relief may be granted.  28 U.S.C. § 1915(e)(2)(B)(ii).

### 5.    *"Racial and Cultural Discrimination" Under 42 U.S.C. § 1981*

Mr. Reynolds-El asserts a claim of "racial and cultural discrimination" under 42 U.S.C. § 1981.  Under Section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  § 1981.  The statute specifically applies in the context of making and enforcing contracts.  It "prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race . . . ."

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989)).  To plead a Section 1981 claim, "a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Id.*  Mr. Reynolds-El does not plausibly allege that the defendants interfered with his contractual rights, nor impeded him from accessing the courts to adjudicate a dispute about binding obligations.  Thus, he has not stated a cognizable Section 1981 claim.  Therefore, I recommend that his Section 1981 claim be dismissed for failure to state a claim upon which relief may be granted.  28 U.S.C. § 1915(e)(2)(B)(ii).

      **6.**       ***"Racial and Cultural Discrimination" Under 42 U.S.C. §§ 1985 and 1986***

Mr. Reynolds-El also claims "racial and cultural discrimination" under 42 U.S.C. § 1985(3).  (Compl. at 4.)  Relatedly, he asserts a claim of "failure to prevent violations" under 42 U.S.C. § 1986, a claim which is "predicated upon a valid § 1985 claim."  *Mian*, 7 F.3d at 1088.  The four elements of a claim under Section 1985(3) are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Id.* at 1087.  "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.  Furthermore, the "conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators'

action." *Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013) (summary order) (citation and quotation marks omitted).

Mr. Reynolds-El does not allege any facts plausibly supporting a racial or class-based conspiracy. He alleges that two of the defendants, Ms. Brown and Mr. Pierro, "had constructive notice of Plaintiff's status and failed to take corrective action, effectively furthering the conspiracy to deprive Plaintiff of liberty." (Compl. at 3.) He also generally alleges a "coordinated failure by [the defendants] to respect Plaintiff's treaty protections, nationality, and medical needs," which he asserts was a "systemic violation of [his] rights[.]" (*Id.* at 4.) But he does not allege any facts that, if he were to prove them, would show that any of the defendants conspired to deprive him of his rights out of racial or class-based animus. Therefore, I recommend that Mr. Reynolds-El's Section 1985 and Section 1986 claims be dismissed for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915(e)(2)(B)(ii).

### 7. *"Violations of International Treaty Law"*

Mr. Reynolds-El claims "violations of international treaty law," asserting that the defendants have violated several international laws and conventions. He invokes the "Treaty of Peace and Friendship of 1836 between the United States and Morocco," the Convention on the Prevention and Punishment of the Crime of Genocide, the Vienna Convention on Consular Relations, the Convention Against Torture, and the International Covenant on Civil and Political Rights. (Compl. at 1-3.) To begin with, it is important to note the presumption that international agreements "do not create privately enforceable rights in the absence of express language to the contrary[.]" *Mora v. New York*, 524 F.3d 183, 201 (2d Cir. 2008) (quoting *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008)). This presumption applies "even when international treaties appear to confer benefits on individuals." *Id.* In other words, the general rule is that a person cannot enforce

a treaty by filing a lawsuit, even if the treaty says that it creates individual rights.  There are exceptions to this general rule but, as explained in further detail below, none of these exceptions apply here.

> a.    Treaty of Peace and Friendship of 1836 between the United States and Morocco

Mr. Reynolds-El invokes the "Treaty of Peace and Friendship of 1836 between the United States and Morocco."[11]  (Compl. at 2.)  He asserts that he is a "Moorish American national"[12] and, therefore, entitled to certain protections under that treaty.  (*Id.*)  He claims that the defendants violated his rights under the treaty when they "neither acknowledged nor upheld" its protections and ignored "filings and oral declarations invoking treaty rights, nationality, and jurisdictional objections." (*Id.* at 2-3.)

Courts have consistently held that the Treaty of Peace and Friendship does not create any privately enforceable rights.  *E.g., Powell v. New York State Dep't of Educ.*, No. 18-cv-7022 (RPK)(PK), 2022 WL 900605, at *5 (E.D.N.Y. Mar. 28, 2022) (collecting cases); *Bey v. Furman*, No. 21-cv-4090 (WFK)(RER), 2021 WL 3725987, at *2 (E.D.N.Y. Aug. 23, 2021) (collecting cases).  "[A] litigant's reliance on any Barbary Treaty, including on the Treaty with Morocco, for

---

[11]    The Moroccan-American Treaty of Peace and Friendship, also referred to as the "Treaty of Marrakech," was signed in 1786 and ratified by the United States in 1787.  In 1836, the United States and Morocco signed the Treaty of Peace, which substantively renewed the 1786 Treaty of Peace and Friendship.  "The Treaty with Morocco is one of the Barbary Treaties (executed, during 1795–1836 between the United States and semi-autonomous North African city-states of Algiers, Tunis, and Tripoli, and the Sultanate of Morocco)."  *El Ameen Bey v. Stumpf*, 825 F. Supp. 2d 537, 558 n.10 (D.N.J. 2011).

[12]    Mr. Reynolds-El's claims of Moorish American nationality "suggest that [he] is a 'Moorish American' adherent of the Moorish 'sovereign citizen' movement, which the Second Circuit has described 'a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior.'" *Murphy v. Fed. Sav. Bank*, No. 3:23-cv-1552 (KAD), 2025 WL 1707803, at *4 n.6 (D. Conn. June 18, 2025) (quoting *United States v. Ulloa*, 511 Fed. App'x. 105, 107 n.1 (2d Cir. 2013) (summary order)).

the purposes of a civil suit raising claims based on the events that occurred within what is the United States' geographical territory is facially frivolous. . . ." *Bey v. City of Rochester*, No. 11-cv-6457, 2012 WL 1565636, at *7 (W.D.N.Y. Apr. 30, 2012) (quoting *El Ameen Bey*, 825 F. Supp. 2d at 558). Therefore, I recommend that Mr. Reynold-El's claim that the defendants violated the Treaty of Peace and Friendship be dismissed as frivolous. 28 U.S.C. § 1915(e)(2)(B)(i).

> b. Convention on the Prevention and Punishment of the Crime of Genocide

Mr. Reynolds-El next attempts to invoke the Convention on the Prevention and Punishment of the Crime of Genocide (the "Genocide Convention"). (Compl. at 1.) The United States criminalized the specific act of genocide in the Genocide Convention Implementation Act of 1987, 18 U.S.C. §§ 1091-93, but the Genocide Convention Implementation Act does not create "any substantive or procedural right enforceable by law by any party in any proceeding." 18 U.S.C.A. § 1092; *Kadic v. Karadzic*, 70 F.3d 232, 242 (2d Cir. 1995). Even if the Genocide Convention Implementation Act created a private right of action, Mr. Reynolds-El does not allege that any of the defendants, "with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group[,]" killed or caused "serious bodily injury" to members of that group; caused "the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques[;]" or "subject[ed] the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part." 18 U.S.C.A. § 1091(a). Accordingly, I recommend that Mr. Reynold-El's claim that the defendants violated the Genocide Convention be dismissed as frivolous. 28 U.S.C. § 1915(e)(2)(B)(i).

> c. Vienna Convention on Consular Relations

Mr. Reynolds-El next claims that the defendants violated the Vienna Convention when they did not acknowledge or uphold his "consular rights" and "entitle[ment] to consular access[.]"

(Compl. at 2.) Article 36(1)(b)(third) of the Vienna Convention gives authorities the obligation to "inform an alien of the consular notification and access requirements" set forth in the Convention, but "it does not authorize an individual to vindicate in an action for damages a violation of Article 36(1)(b)(third) pursuant to § 1983, [the Alien Tort Statute], or directly under the Convention." *Mora*, 524 F.3d at 209. Even if an individual could bring an action for damages for a violation of the Convention, Mr. Reynolds-El has failed to show that any violation occurred. He alleges that he is a "natural Moorish American national and U.S. citizen," (Compl. at 2), but even if the Court were to assume that his purported status as a "Moorish American national" means that he is a citizen of another country,[13] he is still also a U.S. citizen. "[I]t is a recognized fact of international law that a dual national is never entitled to invoke the protection or assistance of one of the two countries while within the other country." *United States v. Matheson*, 400 F. Supp. 1241, 1245 (S.D.N.Y. 1975), *aff'd*, 532 F.2d 809 (2d Cir. 1976). Because Mr. Reynolds-El was not entitled to consular notification or access pursuant to the Vienna Convention, and because he would not have a private cause of action even if such an entitlement existed and the defendants violated it, I recommend that this claim be dismissed as frivolous. 28 U.S.C. § 1915(e)(2)(B)(i).

> d.  The Convention Against Torture and the International Covenant on Civil and Political Rights

Finally, Mr. Reynolds-El asserts violations of the Convention Against Torture ("CAT") and International Covenant on Civil and Political Rights ("ICCPR"). Neither of these international treaties create a private right of action. *See Yuen Jin v. Mukasey*, 538 F.3d 143, 159 (2d Cir. 2008) (CAT); *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 257 n.35 (2d Cir. 2003) (ICCPR).

---

[13]  The United States does not recognize any "Moorish" nation as a sovereign state. *E.g.*, *Allah El*, 2009 WL 3756331, at *1.

Therefore, I recommend that Mr. Reynolds-El's claims that the defendants violated the CAT and the ICCPR be dismissed as frivolous.  28 U.S.C. § 1915(e)(2)(B)(i).

### 8.    *"Conspiracy Against Rights" Under 18 U.S.C. § 241 and § 242*

Mr. Reynolds-El next attempts to bring claims under two federal criminal statutes.  (Compl. at 4.)  18 U.S.C. § 241 criminalizes "conspir[ing] to injure, oppress, threaten, or intimidate any person in any State . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same[.]"  18 U.S.C. § 242 criminalizes "depriv[ing]" others "of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States" "under color of any law, statute, ordinance, regulation, or custom[.]"

It is well established, however, that private persons like Mr. Reynolds-El cannot recover damages or obtain other civil relief from a federal criminal statute.  *E.g., Genao v. Detectives Endowment Ass'n*, No. 3:20-cv-1833 (AVC) (TOF), 2021 WL 11581028, at *3 (D. Conn. Feb. 10, 2021), *report and recommendation approved and adopted*, slip op. (D. Conn. Mar. 18, 2021).  The Second Circuit has held that "[a] private individual may bring suit under a federal statute only when Congress specifically intended to create a private right of action."  *Hill v. Didio*, 191 F. App'x 13, 14 (2d Cir. 2006) (summary order).  Generally, "federal criminal statutes do not provide private causes of action."  *Sheehy v. Brown*, 335 Fed. App'x 102, 104 (2d Cir. 2009) (summary order).  Courts in this circuit have specifically held that 18 U.S.C. § 241 and 18 U.S.C. § 242 are federal criminal statutes that do not create private rights of action.  *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 511 (2d Cir. 1994) (identifying 18 U.S.C. § 242 as a  federal criminal statute that does not provide a private right of action); *Burke v. APT Found*., 509 F. Supp. 2d 169, 173 (D. Conn. 2007) (concluding that 18 U.S.C. §§ 241 and 242 do not provide private

rights of action to civil litigants). Accordingly, I recommend that Mr. Reynolds-El's "conspiracy against rights" claim under 18 U.S.C. §§ 241 and 242 be dismissed as frivolous.  28 U.S.C. § 1915(e)(2)(B)(i).

### 9.    *"Destruction or Suppression of Public Records"*

Mr. Reynolds-El asserts a claim of "destruction or suppression of public records," in violation of Sections 5403, 5407, and 5408 of "Title LXX."  (Compl. at 4.)  The current United States Code does not include a "Title LXX."  Mr. Reynolds-El cannot bring a claim under a statute that is no longer in effect.  *See Bey v. Sessler*, No. 23-3421, 2024 WL 2078564, at *3 (6th Cir. Feb. 29, 2024) (affirming lower court's decision to dismiss claims brought under Title LXX because Title LXX is not in effect).  Statutes currently in effect that relate to the destruction, suppression, or general production of public records include 18 U.S.C. § 2071 (concealment, removal, or mutilation generally); Conn. Gen. Stat. § 53-153 (unlawful removal or alteration of records); or the Connecticut Freedom of Information Act, Conn. Gen. Stat. § 1-200 *et seq.*  But none of these statutes create private rights of action.  *See Dugar v. Coughlin*, 613 F. Supp. 849, 852 n.1 (S.D.N.Y. 1985) (18 U.S.C. § 2071 does not create private right of action); *Pane v. City of Danbury*, 267 Conn. 669, 673 (2004) (Connecticut Freedom of Information Act does not create private right of action), *overruled on other grounds*, *Grady v. Town of Somers*, 294 Conn. 324 (2009); *McNiece v. Lombardi Gravel & Excavation, LLC*, No. KNLCV175015464, 2018 WL 1735257, at *2 (Conn. Super. Ct. Mar. 7, 2018) (Conn. Gen. Stat. § 53-153 does not create private right of action).  Accordingly, I recommend that Mr. Reynolds-El's "destruction or suppression of public records" claim be dismissed as frivolous.  28 U.S.C. § 1915(e)(2)(B)(i).

## V.    CONCLUSION

For the reasons stated in Section III, Mr. Reynolds-El's motion for leave to proceed *in forma pauperis* is granted.  And for the reasons stated in Section IV, I recommend that Judge

Dooley dismiss all the claims in the complaint.  I further recommend, however, that the dismissal be without prejudice to repleading.  If my recommendation is accepted, this would mean that Mr. Reynolds-El could file an amended complaint attempting to cure the defects identified in this recommended ruling.  *See, e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  There may be no cure for those defects, but *pro se* plaintiffs are usually given "leave to amend at least once." *Id.* (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir.1999)).

This is a recommended ruling by a magistrate judge.  Fed. R. Civ. P. 72(b)(1); D. Conn. L. Civ. R. 72.1(C).  **If Mr. Reynolds-El wishes to object to my recommendation, he must file that objection with the Clerk of the Court by December 22, 2025.**  Fed. R. Civ. P. 72(b)(2); D. Conn. L. Civ. R. 72.2(a) (allowing fourteen days for objections to magistrate judges' recommended rulings, plus "five (5) additional days" for litigants who, like Mr. Reynolds-El, will "receiv[e] notice of an order or recommended ruling from the Clerk by mail"); *see also* Fed. R. Civ. P. 6 (explaining how time is calculated under the Federal Rules of Civil Procedure).  If he does not file an objection by December 22, 2025, he will not be able to assign as error any defect in this recommended ruling.  D. Conn. L. Civ. R. 72.2(a).  Failure to file a timely objection will also prevent him from obtaining appellate review.  *See* 28 U.S.C. § 636(b)(1); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision."); *accord Impala v. U.S. Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order).

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge